RUSSELL NORMAN COLEMAN *v.*
STATE OF MARYLAND

[No. 835, September Term, 1980.]

*Decided June 16, 1981.*

The cause was submitted on briefs to MOYLAN, MELVIN and MACDANIEL, JJ.

Submitted by *Patricia A. Logan, Assistant Public Defender,* and *Alan H. Murrell, Public Defender,* for appellant.

Submitted by *Stephen B. Caplis, Assistant Attorney Gen-*

eral, *Stephen H. Sachs, Attorney General, Warren B. Duckett, Jr., State's Attorney for Anne Arundel County,* and *Gerald Anders, Assistant State's Attorney for Anne Arundel County,* for appellee.

MELVIN, J., delivered the opinion of the Court.

The State has now twice obtained a conviction of second degree murder against the appellant, Russell Norman Coleman. The first such conviction was overturned by this Court in *Coleman v. State,* C.S.A. No. 1334, S.T. '78 (unreported per curiam, filed July 5, 1979) where, having concluded that the trial court had erred in its instructions to the jury, we reversed and remanded the case for a new trial. Upon retrial by a jury in the Circuit Court for Anne Arundel County, appellant was once again convicted of second degree murder and sentenced to a term of thirty years. From this conviction, appellant has brought the present appeal in which he raises essentially seven issues for our review. Though recast, we think the following accurately state the issues presented by appellant:

1. Was the State's evidence sufficient to sustain the conviction?
2. Did the trial court err in failing to dismiss the indictment because of pre-trial delay?
   a. Did the pre-trial delay violate Md. Rule 746?
   b. Did the pre-trial delay deny appellant his Sixth Amendment right to speedy trial?
3. Did the trial court err in allowing an indictment charging first degree murder to be read to the jury prior to trial and submitted to the jury for use in their deliberation?
   a. Under these circumstances, was appellant's Fifth Amendment guarantee against double jeopardy abridged?
   b. Under these circumstances, was Md. Rule 758a violated?

4.  Did the trial court err in allowing the State to introduce the prior recorded testimony of Alan Lanning?
5.  Did the trial court err in failing to more narrowly circumscribe the State's cross-examination of the court's witnesses?
6.  Did the trial court err in admitting to evidence certain prior consistent statements made by Carlotta Barfield?
7.  Did the trial court err in its instructions to the jury?

Having thoughtfully considered each of these issues, we find no merit in any of them and therefore shall affirm appellant's conviction.

## SUFFICIENCY OF THE EVIDENCE

The record reveals that shortly after 11:00 P.M., March 5, 1977, Michael Wood received what later proved to be a fatal gunshot wound while standing in the kitchen of a house that he occupied with his wife and her two children in Glen Burnie (Anne Arundel County), Maryland. The fatal bullet entered the kitchen from outside the house, passing through a screen and a glass pane in the back door. Apparently, the shooting was in retribution for a fraudulent drug transaction perpetrated by Wood earlier that same evening.

At approximately 9:00 P.M. that evening, Wood was at home with his wife when he was visited by a friend, Alan Lanning. According to Lanning's prior recorded testimony,[1] both he and Wood were heroin users and, on this particular night, Wood had suggested a plan for getting some heroin without having to pay for it. Wood "was going to crush up some aspirin or something and make up a bag like dope." Lanning testified that he and Wood did in fact make up a phony bag of heroin and then drove to a large apartment complex in

---

1. Because Mr. Lanning was unavailable for trial, the transcript of his testimony from the first trial was read to the jury.

Baltimore. Upon their arrival, Wood got out of the car, went towards the building, and called the name "Theresa." According to Lanning, that triggered the following events:

> "Somebody came to the window, looked out, and Mike [Wood] got back in the car. And this girl comes down and hands Mike a bag of dope, you know. He told her what he wanted and everything. Hands him a bag of dope and he makes out like . . . out like he's giving it to me but he just dropped it on the floor and he gave me the one that we had made up, you know, so I opened it up and looked at it and talked back and forth with Mike a little bit. I just tell her it's too small and folded it back up and give it to her and we got out of there."

Having thus switched the phony bag of heroin for the real one, Wood and Lanning returned to Wood's house and divided their plunder. Lanning left shortly thereafter. and Wood remained in the living room talking with his wife until approximately 11:00 P.M. when he went into the kitchen where he was shot.

What appears to have been the other side of the Wood/Lanning drug swindle was described at trial by the appellant's girlfriend, Carlotta Barfield.[2] Carlotta, who lived in an apartment in Baltimore with appellant and her then fourteen year old son, Rodney Barfield, testified that she knew Wood because he "used to purchase dope" from her and the appellant. More importantly, she recounted a particular encounter that she had had with Wood in the parking lot adjacent to the apartment building in which she lived. Carlotta testified that on that occasion, "[Wood] called up the house and asked for some powder" and that she obligingly took some heroin out to Wood who was then waiting in a car. On her way out, she passed the appellant and Frank Darby [3] as they were just coming in. According to

---

2. According to the testimony of Mrs. Wood. Carlotta Barfield was also known as "Theresa."

3. Frank Darby was a friend of the appellant who happened to be staying with appellant and Carlotta at the time of this incident.

Carlotta, when she reached the car in which Wood was sitting, the following transpired:

> "I gave [Wood] some dope and he showed it to this other boy and he showed it to this other boy and he gave it back to me and told me that it wasn't enough weight."

Wood and his companion departed following this colloquy, and Carlotta returned inside where she gave to appellant what she thought was the same bag of heroin that she had taken downstairs and allowed Wood to inspect. Appellant tasted the contents of the bag, realized that it was not heroin, and "said something like Michael got over on him." With that he left, refusing to allow either Carlotta or Darby to accompany him. Although appellant left the apartment alone, Carlotta observed from the window that he was not alone in the car. Carlotta learned later that appellant was accompanied that night by her son, Rodney.

In that connection, Rodney testified that he was playing in the hall of the apartment building when appellant came down and invited him to come along. According to Rodney, he then rode with appellant "to the county." Precisely where they went, Rodney was not certain; however, he did recall that appellant stopped the car in the parking lot of a restaurant that had lights strung around the roofline, and, having seen a road sign, he "figured" that it was in Glen Burnie. Rodney's recollection of the restaurant was significant because Mrs. Wood, the victim's wife, testified that behind their house was a patch of woods and just beyond the wooded area was a restaurant with "lights that are around the eaves of the building."

Rodney testified further that after stopping the car at the restaurant, appellant got out, took a silver gun from under the seat, and walked away. Not long thereafter, Rodney, who was still in the car, heard what he believed to be a gunshot. Having been gone a total of five to ten minutes, appellant then returned to the car, placed the gun on the seat, and drove back to Baltimore. Rodney recalled touching the gun and feeling that it was warm. Furthermore, although appel-

lant did not say anything when he returned to the car, Rodney subsequently overhead appellant telling Darby that he had shot Wood.

Similar admissions by appellant were revealed in Carlotta's testimony:

> "Q [State's Attorney]: Alright. Did ... from that date on, the date that it occurred and until Jimmy [appellant] was arrested, what did Jimmy tell you about what had happened between him and Michael, what he had done?
>
> MR. GREENE [Defense Counsel]: Objection for the record.
>
> COURT: Overruled.
>
> A [Carlotta]: Like ... like I said, I can't remember everything, right, so he said that he wanted to scare Mike [Wood]. He didn't want to, you know, he didn't want to shoot Mike or nothing. He said he wanted to scare Mike and he thought that Mike was accidentally shot in the leg.
>
> Q By him?
>
> A Yes. . . .
>
>                     * * *
>
> Q But he [appellant] did admit that he had shot Mike, but that he didn't mean to do it?
>
> A Yes.
>
> Q And he also told you that he had shot him in the kitchen of his house?
>
> MR. GREENE: Objection.
>
> COURT: Overruled.
>
> A Yes."

It was on these facts that the jury at appellant's retrial returned the conviction of second degree murder complained of here. Considering appellant's admissions together with

the other evidence showing motive, opportunity and means of commission, we think a rational trier of fact could have found the essential elements of the crime and concluded that appellant was the criminal agent beyond a reasonable doubt. Therefore, contrary to appellant, we conclude that the evidence was legally sufficient. *See generally, Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Allen v. State,* 39 Md. App. 686, 690, 389 A.2d 909, *cert. denied,* 283 Md. 729 (1978).

## PRE-TRIAL DELAY

Appellant's next contention in this appeal is that the trial court erred in refusing to dismiss the indictment because of pre-trial delay. It should be noted that this complaint is directed solely at the delay in appellant's retrial following our remand for that purpose; appellant has not attempted to impugn the timeliness of his first trial in either of his two appeals. With regard to the delay in retrial, appellant asserts that it was of such a magnitude and character as to violate both Md. Rule 746 and the Sixth Amendment speedy trial provision. The factual basis for this assertion is, for the most part, set forth in the following chronology:

| | |
|---|---|
| July 5, 1979 — | *Coleman v. State,* C.S.A. No. 1334 (per curiam) was filed, reversing appellant's first conviction. |
| July 16, 1979 — | Letter by appellant, requesting a speedy trial, was received by the Clerk of the Anne Arundel County Circuit Court. |
| August 6, 1979 — | Mandate issued in *Coleman v. State,* reversing and remanding for a new trial. |
| October 24, 1979 — | Hearing on counsel conducted; public defender was requested. |

| | |
|---|---|
| November 8, 1979 — | Gill Cochran, Esq. entered appearance as counsel. (Appointed by public defender's office). |
| November 15, 1979 — | Motion for Speedy Trial filed. |
| February 6, 1980 — | Letter filed by defense counsel, Cochran, notifying the court of appellant's dissatisfaction with his services and requesting a postponement to allow another public defender to take the case. |
| February 7, 1980 — | Date originally set for trial. |
| February 8, 1980 — | Continuance notice filed. |
| February 8, 1980 — | Writ of Habeas Corpus was filed by appellant. The writ was denied by the court which treated it as a motion for speedy trial and/or motion to dismiss. |
| March 18, 1980 — | Appearance entered by Clayton Greene, Esq. (public defender's office) as counsel. |
| March 18, 1980 — | Motion to dismiss for lack of speedy trial filed. |
| April 1, 1980 — | Trial began. Motion to dismiss for lack of speedy trial was renewed and dismissed. |

Given this chronological breakdown of the period between remand and retrial, we now consider whether that period was unlawfully excessive.

### Rule 746

Maryland Rule 746 a in its present form provides that,

"Within 30 days after the earlier of the

appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 723, a trial date shall be set which shall be not later than 180 days after the appearance or waiver of counsel or after the appearance of defendant before the court pursuant to Rule 723."

Since the mandate of *State v. Hicks,* 285 Md. 310, 403 A.2d 356 (1979), which issued July 25, 1979, Rule 746 has had a mandatory effect, requiring dismissal in the event of violation. Moreover, prior to November 16, 1979, the limit specified for delay between the appearance of counsel or first appearance of the defendant and the trial date was 120 rather than 180 days. Inasmuch as the appellant's first appearance in the present case was October 24, 1979 (twenty-three days prior to the amendment extending the allowable period to 180 days), he contends that his case is governed by the 120 day version of the rule. Further, appellant asserts that Rule 746 was violated because the case was not tried until April 1, 1980, the 160th day.

Even if Rule 746 were applicable to the present case, which it is not, we would find appellant's argument unpersuasive. The order adopting the change in the Rule that extended the allowable period from 120 to 180 days specified that the change "shall apply to all proceedings . . . commenced [after November 16, 1979] *and, so far as practicable, to all proceedings then pending.*" (Emphasis added). Since we can see no compelling reason why it would not have been "practicable" to apply the 180 day version of the rule to the present case, trial on the 160th day would have been timely even if Rule 746 were applicable.

In fact, however, we conclude that Rule 746 has no application to the present case and, for that reason alone, could not have been violated. It is the first bringing to trial that is contemplated by Rule 746, as well as its authorizing statute, Art. 27, § 591. Neither the rule nor the statute prescribes the period within which trial shall be had in the event of remand. *State v. Mines,* 48 Md. App. 30, 38, 425 A.2d 1044 (1981); *Donalds v. State,* 49 Md. App. 106, 109, 430 A.2d

113 (1981). Consequently, Rule 746 affords no protection against excessive delay in retrial after remand; the only protection that exists against such delay is that provided by the Sixth Amendment speedy trial guarantee.

## Speedy Trial

Whenever we are called upon to determine whether a pre-trial delay was such that it infringed a defendant's constitutional right to a speedy trial, we must conduct a dual level analysis. Preliminarily, we must decide whether the length of the delay is of constitutional dimension. Then, if this threshold is crossed, we must engage in a difficult and sensitive balancing process in which we weigh the conduct of both the prosecution and the defendant. *Barker v. Wingo,* 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Delay produced by reversals obtained by an accused's efforts is not relevant to the analysis. *See Britton v. State,* 10 Md. App. 70, 73, 267 A.2d 747, *cert. denied,* 259 Md. 730 (1970). Hence, in the present case, we are only concerned with the time elapsed between the issuance of the mandate remanding the case to the trial court (August 6, 1979) and the beginning of trial (April 1, 1980), a total of seven months and twenty-five days.

Whether a pre-trial delay is of constitutional dimension and, therefore, sufficient to trigger the *Barker* balancing test is dependent upon "the peculiar circumstances of the case," as well as the length of the delay. *Barker, supra,* at 530-531. As an example, the Court in *Barker,* observed that, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.* at 531. Taking guidance from this observation, we concluded that a delay as short as eight months and eight days was of constitutional dimension — in the context of a "common garden variety" burglary and larceny case. *Schmitt v. State,* 46 Md. App. 389, 416 A.2d 296 (1980). The rationale implicit in *Schmitt* and the *Barker* instruction to consider the "peculiar circumstances" of the case in making

the threshold speedy trial determination is that different cases will naturally demand of the State different amounts of trial preparation, and the amount of time reasonably necessary for trial preparation, after the speedy trial clock has begun to run in a particular case, should be considered in determining whether there has been a true "delay" worthy of constitutional scrutiny.

Applying this reasoning, we firmly rejected a contention by the State that a delay of nine months and twenty-three days in bringing a defendant to trial for arson and related crimes was not of constitutional dimension. *State v. Hiken*, 43 Md. App. 259, 272, 405 A.2d 284 (1979). While acknowledging that arson was undoubtedly of greater complexity than an ordinary street crime, we noted that in that particular case the police and the Office of the State's Attorney had already conducted a nine-month investigation even before the defendant's indictment and arrest. In view of that peculiar circumstance, Judge Moore observed for the Court, "the State was, or certainly should have been, ready for trial within a very short time after the indictments. . . ." *Id.* at 272.

The present case, involving a drug-related murder, would probably appear on the spectrum of complexity somewhere between *Schmitt* and *Hiken*. Nevertheless, we think that, under the "peculiar circumstances" of this case, the State here should have been prepared for trial in less time than that which would have been reasonable in either of those cases. The trial delayed in this case was not the initial trial of a defendant on an unfamiliar charge, rather it was a retrial of the same defendant on the same charge following our reversal of his first conviction. Having already completely tried the case once, the State should have been ready for trial virtually from the start of the speedy trial clock. Consequently, we conclude that a pre-trial delay of just under eight months, in a remand situation such as this, is plainly of constitutional dimension, requiring analysis under the *Barker* balancing test.

The balancing test established in *Barker* requires con-

sideration of at least four factors: 1) length of delay, 2) reasons for the delay, 3) the defendant's assertion of his right, and 4) prejudice to the defendant. In evaluating the length of delay as a factor in the balance, we again think it significant that this delay comes in the context of a retrial. Given the State's familiarity with the case, having completely tried it once, we think that something less than the ordinary six-month allowance for orderly processing of the case is appropriate. *Cf. Wise v. State,* 47 Md. App. 656, 675, 425 A.2d 652 (1981); *Darby v. State,* 45 Md. App. 585, 589, 414 A.2d 248 (1979). Nevertheless, recognizing that a certain amount of delay is inherent for ordinary scheduling purposes even in the case of a remand, a delay of less than eight months, though clearly sufficient to cross the constitutional threshold, is not grossly inordinate. Moreover, the significance to be attached to this delay is attenuated when we consider that the reason for the delay apparently did not involve any willfulness on the part of the State and that nearly two months of the delay (February 7, 1980 to April 1, 1980) was attributable to appellant's dismissal of appointed counsel. This is not to belittle appellant's early and repeated assertion of his speedy trial right or the fact that he was incarcerated from the time of the mandate to the time of retrial and was prejudiced to some extent thereby. However, on balance, having carefully considered each of these factors, under all of the circumstances, we have concluded and now hold that appellant's constitutional right to a speedy trial was not infringed.

## INDICTMENT

Two indictments were returned by the grand jury in this case. The first indictment — No. 21,065 — was the one pursuant to which appellant was originally charged and tried for first degree murder. Under that indictment, the jury acquitted appellant of first degree murder but found him guilty of the lesser included offense of murder in the second degree. It was from that conviction that appellant took his first appeal. After our reversal of his conviction, appellant

was scheduled for retrial under the original indictment. Then, on March 31, 1980, one day before the retrial from which the current appeal was brought, a second indictment — No. 23,546 — was handed down by the grand jury. This indictment, framed in a single count substantially the same as that suggested by Md. Code Art. 27, § 616, reads in pertinent part as follows:

"THE GRAND JURY charges that the aforesaid defendant, on or about the aforesaid date, feloniously, wilfully, and of deliberately premeditated malice aforethought did kill and murder Michael Lynn Wood. (Article 27, Section 407-410)."

On April 1, 1980, just prior to the jury selection for appellant's retrial, the State nolle prossed the original indictment in its entirety and nolle prossed Indictment No. 23,546 to the extent that it charged first degree murder. Over timely objections, the latter indictment, as quoted above, was read to the jury before voir dire and was submitted to the jury at the end of trial for their use in deliberation. Under these circumstances, appellant contends 1) that he has been subjected to double jeopardy in violation of the federal constitution, and 2) that Md. Rule 758a has been violated. For the reasons to be set forth, we disagree with both contentions.

### Double Jeopardy

Where a criminal defendant's conviction is set aside because of an error in the jury instructions, the Fifth Amendment guarantee against double jeopardy does not bar the State from retrying the defendant for the same offense for which he was originally convicted. *Price v. Georgia*, 398 U.S. 323, 90 S. Ct. 1757, 26 L. Ed. 2d 300 (1970); *see Sweetwine v. State*, 288 Md. 199, 204, 421 A.2d 60 (1980). However, if the defendant was originally tried for a greater offense and a lesser included offense based upon the same act but was only convicted of the lesser offense, he cannot be retried for the greater. *Price, supra; Green v. United States,*

355 U.S. 184, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957). Hence, in the present case, although appellant Coleman was properly subject to retrial for second degree murder, it is clear that he could not be retried for the greater offense of murder in the first degree. The question then is whether appellant was so retried.

Though Indictment No. 23,546 is couched in terms of first degree murder, the state — at the outset of appellant's retrial prior to the jury being sworn or impaneled — nolle prossed that indictment to the extent that it charged murder in the first degree. Therefore, inasmuch as, in the case of a jury trial, jeopardy does not attach until the jury is impaneled and sworn, *Crist v. Bretz,* 437 U.S. 28, 98 S. Ct. 2156, 57 L. Ed. 2d 24 (1978); *Blondes v. State,* 273 Md. 435, 330 A.2d 169 (1975), it is plain that as to the first degree murder charge jeopardy did not attach a second time. In other words, appellant was simply not retried on that charge, and the Fifth Amendment guarantee against double jeopardy was not offended. *Cf. Price v. Georgia,* 398 U.S. 323, *supra.*

### Rule 758

Maryland Rule 758 a provides:

> "Upon retiring for deliberation, the jury may, with the approval of the court, take into the jury room all exhibits which have been admitted into evidence and charging documents which reflect only the charges upon which the jury is to deliberate, subject only to the safeguards imposed by the court for the preservation of the exhibits and the safety of the jurors."

In the only reported opinion to yet apply this rule, *Sherman v. State,* 288 Md. 636, 421 A.2d 80 (1980), the Court of Appeals concluded that the submission to the jury of a five count indictment, where the trial judge had granted motions of acquittal on two of the counts, was reversible error. In so holding, the Court said of Rule 758 a that it "provides in

mandatory terms that *no dead counts* of a charging document be before the jury during its deliberations." *Id.* at 641 (emphasis added).

In the present case, the indictment submitted to the jury is composed of a single count closely modeled after a legislatively suggested form. It is well established that under this form of indictment the defendant can be convicted of either first degree murder, second degree murder or manslaughter. *See State v. Ward,* 284 Md. 189, 396 A.2d 1041 (1978). Therefore, although, in the present case, this indictment was nolle prossed to the extent that it charged murder in the first degree, its single count was still very much alive as to the lesser offenses of second degree murder and manslaughter. There simply were no "dead counts" before the jury. To read Rule 758 a as precluding the submission to the jury of a viable single count indictment under these circumstances, we think would be an unwarranted extension of that rule as applied in *Sherman.*

## PRIOR RECORDED TESTIMONY

The State began its case against appellant on retrial with the testimony of Alan Lanning. Because Mr. Lanning could not be located to testify in person at the retrial, a transcript of the testimony that he gave at appellant's original trial was read to the jury. Appellant argues here, as he did below, that the admission of this prior recorded testimony was error because the State did not adequately prove Lanning's "unavailability."

It is now well settled that "testimony taken at a former trial may as a general rule be admitted at a subsequent trial where it is satisfactorily shown that the witness is unavailable to testify." *Crawford v. State,* 282 Md. 210, 214, 383 A.2d 1097 (1978). A witness is legally "unavailable" if it is shown that he is

"dead, insane, or beyond the jurisdiction of the court, *or on diligent inquiry cannot be located,* or that some other circumstance exists which shows

that the witness who gave the testimony at the former trial cannot be procured as a witness at the second trial." *Contee v. State,* 229 Md. 486, 491, 184 A.2d 823 (1962), *cert. denied,* 374 U.S. 841 (1963) (emphasis added).

Thus, where, as here, the State claims that one of its witnesses is unavailable because he cannot be located, the State has the burden of showing that it has made a diligent inquiry in a good faith effort to ascertain the witness' whereabouts. *See Barber v. Page,* 390 U.S. 719, 725, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968).

At a pretrial hearing on the State's motion to be permitted to use Lanning's prior recorded testimony, Detective James Moore of the Anne Arundel County Police Department recounted the efforts he had made, beginning several weeks prior to the retrial, to locate Alan Lanning. Moore explained that he began his inquiry at the residence occupied by Lanning at the time of appellant's original trial; he found that Lanning no longer lived there, and no one at that address knew where he had gone. According to Moore, he then inquired at the Motor Vehicle Administration and the Post Office, but neither agency had any record of a change of address for Lanning. A check with the utility companies was likewise fruitless. Moore testified further that he also checked with a car dealership at which Lanning worked at the time of the first trial but learned that Lanning was no longer employed there and had left no forwarding address. Moore also explained that, in the course of his quest for Lanning, he had contacted numerous acquaintances of Lanning and that none of them knew where he was.

Despite this catalog of fruitless efforts by the State to locate Lanning, appellant contends that it was insufficient because the State did not check with the Internal Revenue Service or the Social Security Administration and did not contact any police officers or paid informants. Although it is undeniable that those additional sources of information suggested may have proved fruitful and perhaps should have been pursued for the sake of completeness, we cannot say

that their omission was fatal under the circumstances. We think that the efforts actually undertaken by the State to locate Lanning for trial demonstrated diligence and good faith on its part sufficient for the trial judge to properly conclude that Lanning was "unavailable." *Cf. Higgins v. State,* 41 Md. App. 177, 396 A.2d 311, *cert. denied,* 284 Md. 744 (1979) (witness was not "unavailable" where the State made no serious effort to procure him).

## CROSS-EXAMINATION

At appellant's retrial, Carlotta Barfield, Rodney Barfield and Frank Darby were all called as the court's own witnesses for purposes of direct examination, thereby, permitting cross-examination of these witnesses by both the State and the defense. Appellant does not challenge the trial judge's decision to allow these witnesses to testify as court witnesses; rather, his complaint here is that the judge erred in allowing the State's cross-examination of these witnesses to go "beyond [the matters] which they had testified to on direct examination by the court."

As we observed in *Robinson v. State,* 18 Md. App. 678, 699, 308 A.2d 734, *cert. denied,* 269 Md. 765 (1973) (quoting from *Williams v. Graff,* 194 Md. 516, 522-523, 71 A.2d 450 (1950)):

> "Where a general subject has been entered upon in the examination in chief, the cross-examining counsel may ask any relevant question on the general subject. *In our judgment the rule limiting cross-examination to the general facts stated on direct examination should not be so applied as to defeat the real object of cross-examination, i.e., to elicit all the facts of any observation or transaction which has not been fully explained.* (Citations omitted). The scope to which the cross-examination may extend rests largely in the discretion of the trial judge, and his ruling thereon will not be disturbed by the Court of Appeals, unless it appears that some injustice has been done. (Emphasis supplied)."

On cross-examination in the present case, the State was permitted to expand considerably the direct testimony given by each of the court's witnesses. However, having carefully reviewed the record, we cannot say that the trial judge abused his discretion, especially when we consider that direct examination was conducted by the judge and was necessarily limited in scope by his relative unfamiliarity with the case.

## PRIOR CONSISTENT STATEMENTS

Appellant's next contention is that the trial court erred in admitting into evidence certain prior consistent statements made by Carlotta Barfield. We conclude, however, that such statements were properly admitted for purposes of rehabilitation.

In response to questions put by the prosecutor at appellant's retrial on April 2, 1980, Carlotta directly implicated appellant in the killing of Wood; indeed, she testified to admissions made by appellant to the effect that he was the criminal agent. On subsequent cross-examination the defense impeached Carlotta's testimony by having her admit that it had been prompted by prosecutorial threats of perjury charges and fear of being jailed therefor. We here set out, in pertinent part, the relevant colloquy between defense counsel and Carlotta at appellant's retrial:

> "Q. [Defense Counsel]: Has the State's Attorney's office, the police department, or anybody guaranteed you any immunity from prosecution or promised you anything in exchange for your testimony today?
>
> A. [Carlotta Barfield]: There was ... okay, uh —
> . . .
> MR. ANDERS [State's Attorney]: Objection, Your Honor.
>
> COURT: No, she can't answer that yes or no.

A. If ... if I was told ... if ... I was told that I perjured twice the last time and that I would get ten years if I perjured this time.

Q. Oh, so, in other words, the last two times they were going to let you slide, is that what you're saying?

A. Yes.

Q. And this time if you don't say what was consistent with your first statement, you're going to get ten years?

MR. ANDERS: Objection.

COURT: Sustained.

\* \* \*

Q. Did you want to testify today?

A. No, I didn't really want to come in court. But I had failed to appear before and I wasn't going to get in no more because I ain't going to go to jail no more. That's the first time I've ever been locked up in jail, I mean, for (?) time.

Q. So is it the fear of jail that caused you to testify today?

MR. ANDERS: Objection. (pause) I'll withdraw the objection.

A. Yes, I'm scared of jail.

Q. Therefore, no one has told you that you will not be prosecuted for perjury, is that correct?

A. I don't understand.

Q. Has the State's Attorney, police or anyone else involved in investigating the case told you that you will not be prosecuted for perjury if you testify today?

A. Yes, he said I won't be prosecuted for perjury if I come in to court and testify and he said a lot of things but I can't recall everything that was said. It was a lot of things but I can't say exactly what he said. He said that I'm not threatening you or

nothing, but you will get ten years on this then if you perjure and he gave me two statements to read over.

In rebuttal, the State introduced a statement given by Carlotta to the police on March 15, 1977 and a transcript of Carlotta's grand jury testimony, dated April 25, 1977. These two pieces of documentary evidence were apparently consistent with Carlotta's live testimony at the retrial and were, therefore, offered and admitted for purposes of rehabilitation.

The rule governing the admissibility of prior consistent statements was articulated by Judge Moylan on behalf of this Court in *Boone v. State,* 33 Md. App. 1, 6, 363 A.2d 550, *cert. denied,* 279 Md. 281 (1976):

> "The general rule is that where the credibility of a witness has been impeached in such a way as to indicate that his present testimony may be a fabrication, prior consistent statements are admissible for rehabilitative purposes if they would tend to show that *such consistency was present prior to the time of probable fabrication.*" (Citations omitted, emphasis added).

While appellant acknowledges this rule, he contends that it does not apply to his case. According to appellant, Carlotta's motive for fabrication was the fear of going to jail and she had this fear since the date of the crime itself. Consequently, appellant asserts that Carlotta's propensity for fabrication was present at the time of her police statement and her grand jury testimony, as well as at the time of the retrial.

As we see it, it may or may not be true that Carlotta was fearful of going to jail from the outset; nevertheless, the record demonstrates that the clear thrust of defense counsel's impeachment of Carlotta was that her testimony at retrial was prompted by the prosecutor's threat that she might be incarcerated for perjury. Since the accusation of perjury could not have arisen until subsequent to both the police statement and the grand jury testimony, the consistency

reflected by those prior statements was plainly "present prior to the time of probable fabrication."

## JURY INSTRUCTIONS

Maryland Rule 757b, in pertinent part, provides:

> "The court may, and at the request of any party shall, give those advisory instructions to the jury as correctly state the applicable law. . . . The court need not grant any requested instruction if the matter is fairly covered by the instructions actually given."

It is now well established that this rule is mandatory, such that

> "a trial judge is required to give a requested instruction which correctly states the applicable law and which has not been fairly covered in instructions actually given, and that the failure to give such an instruction constitutes error." *Lansdowne v. State,* 287 Md. 232, 239, 412 A.2d 88 (1980).

Relying upon this rule, appellant argues that the trial court erred twice in its instructions to the jury in the present case.

### *Court Witnesses*

Apparently no requests for instructions were made by either side prior to the court's charge, but, subsequent thereto, objections were raised as to omissions in the charge. The first such objection raised by appellant concerned the omission of any instruction regarding the procedure of calling court's witnesses:

> "The defense would object to the court failing to instruct the jurors as to certain witnesses being called as court witnesses, that would be Rodney Barfield, Mrs. Barfield and Frank Darby. It is the

defense' position, Your Honor, that it is a violation of due process. In effect, the court has taken upon the role of prosecutor. The jurors ought to know that the State's Attorney does not vouche [sic] for the witness' credibility in order to give him, the defendant, a fair and impartial trial since the witnesses were called in the State's case in chief."

That this objection is sufficient to constitute a timely request for instruction is not questioned. *See Noel v. State,* 202 Md. 247, 252, 96 A.2d 7 (1953). Furthermore, it is clear from the record that no instruction specifically referring to the court's witnesses was given. Nevertheless, we conclude that, under the circumstances, the omission was not error.

Judging from his objection appellant's concern prompting this particular request for instruction was twofold: 1) he was concerned that the calling and questioning of witnesses by the judge made the judge look less than impartial; and 2) he was concerned that the jurors, unaware that the prosecutor was not vouching for the credibility of these witnesses, might give their testimony more weight than it merited. We think that these concerns were adequately addressed by the court's general instructions, wherein it advised the jury, *inter alia*:

"I wish foremost to impress upon you that you should not reach any conclusion or draw any inference from anything I may have said or I may say, or from my tone of voice or manner in advising you that I have an opinion as to the guilt or innocence of the accused. This decision is solely yours to make based upon the competent testimony which has been presented for your consideration as applied to the law as you find it to be.

\* \* \*

You are the sole judges of the credibility of the witnesses and the weight to be given to the testimony of each of them. In judging the credibility of these witnesses, you should bear in mind that a witness

is presumed to speak the truth. This presumption is not conclusive, however, and it may be overcome by contradictory evidence, by the manner in which the witness testifies. His or her ability to observe. The witness' memory by the character of the testimony given by the witness or by evidence pertaining to the witness' motives. You may also consider the reasonableness of that witness' testimony considered in the light of all other evidence in the case and any bias, prejudice, or interest which a witness may have in seeking either the conviction or the acquittal of the accused. The number of witnesses has no bearing upon the weight or the credibility of the testimony and you need not believe testimony which was uncontradicted if its probability for veracity does not impress you. The opinion that any witness is permitted to express is of no greater probative value than the soundness of the reasons which underlie it."

Therefore, we conclude that the matter embodied in the requested instruction was fairly covered in the instructions actually given, such that no error was committed by the refusal to grant the requested instruction. *See England v. State,* 274 Md. 264, 274-276, 334 A.2d 98 (1975).

## Prior Statements

During the course of appellant's retrial, several prior statements, consistent and inconsistent, were introduced. In advising the jury as to the proper use to be made of those statements, the trial court said,

"There have been statements, prior statements of witnesses admitted into evidence for your consideration. When a witness has testified to facts material in a case on trial, it is provable by way of impeachment that he has previously made statements relating to these same facts which are inconsistent with his or her present testimony. You

should bear in mind however that the evidentiary function of a prior inconsistent statement produced at trial serve only to impeach or to reflect upon the veracity of the witness who made it and you may not consider such prior statement as probative or substantive evidence in the proof of a case in chief. *So to reiterate, any such statement may not be considered by you to prove the facts on trial. Any such statement may only reflect upon the veracity of the person who made it or who made the testimony here. You accept the prior statement or you accept the present statement as you see fit, bearing upon the reliability for truth and veracity of the statement of the person who made it.* However, you may not under any circumstances, consider those statements as bearing upon the proof of the facts on trial today. In other words, whether or not Russell Coleman killed Mr. Wood." (Emphasis added.)

Appellant had not previously requested an instruction concerning the prior statements, and his only objection concerning the court's instruction was as follows:

"MR. GREENE [Defense Counsel]: Yes, sir. The second would be the limited ... well, the limited instruction itself, Your Honor, is the defendant's position that a limited instruction does not cure the problems of prior inconsistent statements coming in for their purpose of only impeaching the credibility as opposed to coming in as substantive evidence in the case. The jurors will review the statements, the prior inconsistent statements, the prior statements of all the parties involved, and they will in turn be confused, they will in turn undoubtedly decide the issues raised in this case based upon what was said in those previous statements, again, based upon due process, Your Honor.

MR. ANDERS [State's Attorney]: What do you mean by limited instructions?

MR. GREENE: Limited instructions of what the

court gave. *I'm saying as a fundamental problem with allowing prior inconsistent statements to come in evidence, it's fundamentally . . . I'm just saying a limited instruction cannot cure the problem.* That's what I'm saying." (Emphasis added.)

Now, on appeal, appellant asserts that the court erred in its instruction because 1) the portion of the instruction highlighted above is confusing, and 2) no mention was made of the proper use of prior consistent statements. The short answer to these assertions is that they are not properly before us.

According to Md. Rule 757h, an objection concerning a jury instruction is not reviewable as of right unless Rule 757f was complied with at trial. Maryland Rule 757f requires:

> "If a party has an objection to any instructions, to any omission therefrom, or to the failure to give an instruction he shall make the objection on the record before the jury retires to consider its verdict and shall state distinctly the matter or omission, or failure to instruct to which he objects and the grounds of his objection. Upon request of any party, the court shall receive objections out of the hearing of the jury."

In the present case, we think it plain that appellant's objection below was not directed to the instruction given by the court, to any omission therefrom, or to the failure to give an instruction. On the contrary, appellant's object below was to the court's admission of prior statements and not to the instruction given regarding their use. According to appellant, *no* limiting instruction would have been adequate. Consequently, finding no "plain error" in the instructions actually given, we decline to take cognizance of appellant's assertions which, as we see it, are raised for the first time on appeal.

*Judgment affirmed; costs to be paid by appellant.*